McINTYRE, EXECUTOR OF ESTATE OF McINTYRE,
DECEASED *v.* OHIO ELECTIONS COMMISSION

No. 93–986.   Argued October 12, 1994—Decided April 19, 1995

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. GINSBURG, J., filed a concurring opinion, *post*, p. 358. THOMAS, J., filed an opinion concurring in the judgment, *post*, p. 358. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 371.

*David Goldberger* argued the cause for petitioner. With him on the briefs were *George Q. Vaile, Steven R. Shapiro, Joel M. Gora, Barbara P. O'Toole,* and *Louis A. Jacobs.*

*Andrew I. Sutter,* Assistant Attorney General of Ohio, argued the cause for respondent. With him on the briefs were *Lee Fisher,* Attorney General, *Andrew S. Bergman, Robert A. Zimmerman,* and *James M. Harrison,* Assistant At-

torneys General, *Richard A. Cordray*, State Solicitor, and *Simon B. Karas.*\*

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether an Ohio statute that prohibits the distribution of anonymous campaign literature is a "law . . . abridging the freedom of speech" within the meaning of the First Amendment.[1]

---

\*Briefs of *amici curiae* urging affirmance were filed for the State of Tennessee et al. by *Charles W. Burson*, Attorney General of Tennessee, *Michael E. Moore*, Solicitor General, and *Michael W. Catalano*, and by the Attorneys General for their respective States as follows: *Jimmy Evans* of Alabama, *Bruce M. Botelho* of Alaska, *Winston Bryant* of Arkansas, *Gale A. Norton* of Colorado, *Charles M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *Larry EchoHawk* of Idaho, *Roland W. Burris* of Illinois, *Pamela Fanning Carter* of Indiana, *Chris Gorman* of Kentucky, *Richard P. Ieyoub* of Louisiana, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Jeffrey R. Howard* of New Hampshire, *Deborah T. Poritz* of New Jersey, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Susan B. Loving* of Oklahoma, *T. Travis Medlock* of South Carolina, *Mark Barnett* of South Dakota, and *Jeffrey L. Amestoy* of Vermont; and for the Council of State Governments et al. by *Richard Ruda* and *Lee Fennell*.

*Charles H. Bell, Jr.*, and *Robert E. Leidigh* filed a brief for the California Political Attorneys Association as *amicus curiae*.

[1] The term "liberty" in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States. The Fourteenth Amendment reads, in relevant part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U. S. Const., Amdt. 14, §1. Referring to that Clause in his separate opinion in *Whitney* v. *California*, 274 U. S. 357 (1927), Justice Brandeis stated that "all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States. The right of free speech, the right to teach and the right of assembly are, of course, fundamental rights." *Id.*, at 373 (concurring opinion). Although the text of the First Amendment provides only that "*Congress* shall make no law . . . abridging the freedom of speech . . . ," Justice Brandeis' view has been embedded in our law ever since. See *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 779–780 (1978); see also Stevens, The Bill of Rights: A Century of Progress, 59 U. Chi. L. Rev. 13, 20, 25–26 (1992).

I

On April 27, 1988, Margaret McIntyre distributed leaflets to persons attending a public meeting at the Blendon Middle School in Westerville, Ohio. At this meeting, the superintendent of schools planned to discuss an imminent referendum on a proposed school tax levy. The leaflets expressed Mrs. McIntyre's opposition to the levy.[2] There is no suggestion that the text of her message was false, misleading, or libelous. She had composed and printed it on her home computer and had paid a professional printer to make additional copies. Some of the handbills identified her as the author; others merely purported to express the views of "CONCERNED PARENTS AND TAX PAYERS." Except for the help provided by her son and a friend, who placed some of the leaflets on car windshields in the school parking lot, Mrs. McIntyre acted independently.

---

[2] The following is one of Mrs. McIntyre's leaflets, in its original typeface:

**VOTE NO**

**ISSUE 19 SCHOOL TAX LEVY**

Last election Westerville Schools, asked us to vote yes for new buildings and expansions programs. We gave them what they asked. We knew there was crowded conditions and new growth in the district.

Now we find out there is a 4 million dollar deficit - WHY?

We are told the 3 middle schools must be split because of over-crowding, and yet we are told 3 schools are being closed - WHY?

A magnet school is not a full operating school, but a specials school.

Residents were asked to work on a 20 member commission to help formulate the new boundaries For 4 weeks they worked long and hard and came up with a very workable plan. Their plan was totally disregarded - WHY?

WASTE of tax payers dollars must be stopped. Our children's education and welfare must come first. WASTE CAN NO LONGER BE TOLERATED.

PLEASE   VOTE   NO

ISSUE   19

THANK YOU.

CONCERNED PARENTS
AND
TAX PAYERS

While Mrs. McIntyre distributed her handbills, an official of the school district, who supported the tax proposal, advised her that the unsigned leaflets did not conform to the Ohio election laws. Undeterred, Mrs. McIntyre appeared at another meeting on the next evening and handed out more of the handbills.

The proposed school levy was defeated at the next two elections, but it finally passed on its third try in November 1988. Five months later, the same school official filed a complaint with the Ohio Elections Commission charging that Mrs. McIntyre's distribution of unsigned leaflets violated § 3599.09(A) of the Ohio Code.[3] The commission agreed and imposed a fine of $100.

---

[3] Ohio Rev. Code Ann. § 3599.09(A) (1988) provides:

"No person shall write, print, post, or distribute, or cause to be written, printed, posted, or distributed, a notice, placard, dodger, advertisement, sample ballot, or any other form of general publication which is designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election, or make an expenditure for the purpose of financing political communications through newspapers, magazines, outdoor advertising facilities, direct mailings, or other similar types of general public political advertising, or through flyers, handbills, or other nonperiodical printed matter, unless there appears on such form of publication in a conspicuous place or is contained within said statement the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor. The disclaimer 'paid political advertisement' is not sufficient to meet the requirements of this division. When such publication is issued by the regularly constituted central or executive committee of a political party, organized as provided in Chapter 3517. of the Revised Code, it shall be sufficiently identified if it bears the name of the committee and its chairman or treasurer. No person, firm, or corporation shall print or reproduce any notice, placard, dodger, advertisement, sample ballot, or any other form of publication in violation of this section. This section does not apply to the transmittal of personal correspondence that is not reproduced by machine for general distribution.

"The secretary of state may, by rule, exempt, from the requirements of this division, printed matter and certain other kinds of printed communications such as campaign buttons, balloons, pencils, or like items, the size

The Franklin County Court of Common Pleas reversed. Finding that Mrs. McIntyre did not "mislead the public nor act in a surreptitious manner," the court concluded that the statute was unconstitutional as applied to her conduct. App. to Pet. for Cert. A–34 to A–35. The Ohio Court of Appeals, by a divided vote, reinstated the fine. Notwithstanding doubts about the continuing validity of a 1922 decision of the Ohio Supreme Court upholding the statutory predecessor of § 3599.09(A), the majority considered itself bound by that precedent. *Id.,* at A–20 to A–21, citing *State v. Babst,* 104 Ohio St. 167, 135 N. E. 525 (1922). The dissenting judge thought that our intervening decision in *Talley* v. *California,* 362 U. S. 60 (1960), in which we invalidated a city ordinance prohibiting all anonymous leafletting, compelled the Ohio court to adopt a narrowing construction of the statute to save its constitutionality. App. to Pet. for Cert. A–30 to A–31.

The Ohio Supreme Court affirmed by a divided vote. The majority distinguished Mrs. McIntyre's case from *Talley* on the ground that § 3599.09(A) "has as its purpose the identification of persons who distribute materials containing false statements." 67 Ohio St. 3d 391, 394, 618 N. E. 2d 152, 154

---

or nature of which makes it unreasonable to add an identification or disclaimer. The disclaimer or identification, when paid for by a campaign committee, shall be identified by the words 'paid for by' followed by the name and address of the campaign committee and the appropriate officer of the committee, identified by name and title."

Section 3599.09(B) contains a comparable prohibition against unidentified communications uttered over the broadcasting facilities of any radio or television station. No question concerning that provision is raised in this case. Our opinion, therefore, discusses only written communications and, particularly, leaflets of the kind Mrs. McIntyre distributed. Cf. *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 637–638 (1994) (discussing application of First Amendment principles to regulation of television and radio).

The complaint against Mrs. McIntyre also alleged violations of two other provisions of the Ohio Code, but those charges were dismissed and are not before this Court.

(1993). The Ohio court believed that such a law should be upheld if the burdens imposed on the First Amendment rights of voters are "*'reasonable'*" and "*'nondiscriminatory.'*" *Id.*, at 396, 618 N. E. 2d, at 155, quoting *Anderson* v. *Celebrezze*, 460 U. S. 780, 788 (1983). Under that standard, the majority concluded that the statute was plainly valid:

> "The minor requirement imposed by R.C. 3599.09 that those persons producing campaign literature identify themselves as the source thereof neither impacts the content of their message nor significantly burdens their ability to have it disseminated. This burden is more than counterbalanced by the state interest in providing the voters to whom the message is directed with a mechanism by which they may better evaluate its validity. Moreover, the law serves to identify those who engage in fraud, libel or false advertising. Not only are such interests sufficient to overcome the minor burden placed upon such persons, these interests were specifically acknowledged in [*First Nat. Bank of Boston* v.] *Bellotti*[, 435 U. S. 765 (1978),] to be regulations of the sort which would survive constitutional scrutiny." 67 Ohio St. 3d. at 396, 618 N. E. 2d, at 155–156.

In dissent, Justice Wright argued that the statute should be tested under a more severe standard because of its significant effect "on the ability of individual citizens to freely express their views in writing on political issues." *Id.*, at 398, 618 N. E. 2d, at 156–157. He concluded that § 3599.09(A) "is not narrowly tailored to serve a compelling state interest and is, therefore, unconstitutional as applied to McIntyre." *Id.*, at 401, 618 N. E. 2d, at 159.

Mrs. McIntyre passed away during the pendency of this litigation. Even though the amount in controversy is only $100, petitioner, as the executor of her estate, has pursued her claim in this Court. Our grant of certiorari, 510 U. S.

1108 (1994), reflects our agreement with his appraisal of the importance of the question presented.

## II

Ohio maintains that the statute under review is a reasonable regulation of the electoral process. The State does not suggest that all anonymous publications are pernicious or that a statute totally excluding them from the marketplace of ideas would be valid. This is a wise (albeit implicit) concession, for the anonymity of an author is not ordinarily a sufficient reason to exclude her work product from the protections of the First Amendment.

"Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." *Talley* v. *California*, 362 U. S., at 64. Great works of literature have frequently been produced by authors writing under assumed names.[4] Despite readers' curiosity and the public's interest in identifying the creator of a work of art, an author generally is free to decide whether or not to disclose his or her true identity. The decision in favor of anonymity may be motivated by fear of economic or official re-

---

[4] American names such as Mark Twain (Samuel Langhorne Clemens) and O. Henry (William Sydney Porter) come readily to mind. Benjamin Franklin employed numerous different pseudonyms. See 2 W. Bruce, Benjamin Franklin Self-Revealed: A Biographical and Critical Study Based Mainly on His Own Writings, ch. 5 (2d ed. 1923). Distinguished French authors such as Voltaire (Francois Marie Arouet) and George Sand (Amandine Aurore Lucie Dupin), and British authors such as George Eliot (Mary Ann Evans), Charles Lamb (sometimes wrote as "Elia"), and Charles Dickens (sometimes wrote as "Boz"), also published under assumed names. Indeed, some believe the works of Shakespeare were actually written by the Earl of Oxford rather than by William Shaksper of Stratford-on-Avon. See C. Ogburn, The Mysterious William Shakespeare: The Myth & the Reality (2d ed. 1992); but see S. Schoenbaum, Shakespeare's Lives (2d ed. 1991) (adhering to the traditional view that Shaksper was in fact the author). See also Stevens, The Shakespeare Canon of Statutory Construction, 140 U. Pa. L. Rev. 1373 (1992) (commenting on the competing theories).

taliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible.   Whatever the motivation may be, at least in the field of literary endeavor, the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry.[5]   Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.

The freedom to publish anonymously extends beyond the literary realm.   In *Talley,* the Court held that the First Amendment protects the distribution of unsigned handbills urging readers to boycott certain Los Angeles merchants who were allegedly engaging in discriminatory employment practices.  362 U. S. 60.   Writing for the Court, Justice Black noted that "[p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." *Id.,* at 64.   Justice Black recalled England's abusive press licensing laws and seditious libel prosecutions, and he reminded us that even the arguments favoring the ratification of the Constitution advanced in the Federalist Papers were published under fictitious names.   *Id.,* at 64–65.   On occasion, quite apart from any threat of persecution, an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity.   Anonymity thereby provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent.   Thus, even in the field of

---

[5] Though such a requirement might provide assistance to critics in evaluating the quality and significance of the writing, it is not indispensable. To draw an analogy from a nonliterary context, the now-pervasive practice of grading law school examination papers "blindly" (*i. e.,* under a system in which the professor does not know whose paper she is grading) indicates that such evaluations are possible—indeed, perhaps more reliable—when any bias associated with the author's identity is prescinded.

political rhetoric, where "the identity of the speaker is an important component of many attempts to persuade," *City of Ladue* v. *Gilleo*, 512 U. S. 43, 56 (1994) (footnote omitted), the most effective advocates have sometimes opted for anonymity. The specific holding in *Talley* related to advocacy of an economic boycott, but the Court's reasoning embraced a respected tradition of anonymity in the advocacy of political causes.[6] This tradition is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation.

## III

California had defended the Los Angeles ordinance at issue in *Talley* as a law "aimed at providing a way to identify those responsible for fraud, false advertising and libel." 362 U. S., at 64. We rejected that argument because nothing in the text or legislative history of the ordinance limited its application to those evils.[7] *Ibid.* We then made clear that

---

[6] That tradition is most famously embodied in the Federalist Papers, authored by James Madison, Alexander Hamilton, and John Jay, but signed "Publius." Publius' opponents, the Anti-Federalists, also tended to publish under pseudonyms: prominent among them were "Cato," believed to be New York Governor George Clinton; "Centinel," probably Samuel Bryan or his father, Pennsylvania judge and legislator George Bryan; "The Federal Farmer," who may have been Richard Henry Lee, a Virginia member of the Continental Congress and a signer of the Declaration of Independence; and "Brutus," who may have been Robert Yates, a New York Supreme Court justice who walked out on the Constitutional Convention. 2 H. Storing, ed., The Complete Anti-Federalist (1981). A forerunner of all of these writers was the pre-Revolutionary War English pamphleteer "Junius," whose true identity remains a mystery. See Encyclopedia of Colonial and Revolutionary America 220 (J. Faragher ed. 1990) (positing that "Junius" may have been Sir Phillip Francis). The "Letters of Junius" were "widely reprinted in colonial newspapers and lent considerable support to the revolutionary cause." *Powell* v. *McCormack*, 395 U. S. 486, 531, n. 60 (1969).

[7] In his concurring opinion, Justice Harlan added these words:

"Here the State says that this ordinance is aimed at the prevention of 'fraud, deceit, false advertising, negligent use of words, obscenity, and libel,' in that it will aid in the detection of those responsible for spreading

344

we did "not pass on the validity of an ordinance limited to prevent these or any other supposed evils." *Ibid.* The Ohio statute likewise contains no language limiting its application to fraudulent, false, or libelous statements; to the extent, therefore, that Ohio seeks to justify § 3599.09(A) as a means to prevent the dissemination of untruths, its defense must fail for the same reason given in *Talley.* As the facts of this case demonstrate, the ordinance plainly applies even when there is no hint of falsity or libel.

Ohio's statute does, however, contain a different limitation: It applies only to unsigned documents designed to influence voters in an election. In contrast, the Los Angeles ordinance prohibited all anonymous handbilling "in any place under any circumstances." *Id.,* at 60–61. For that reason, Ohio correctly argues that *Talley* does not necessarily control the disposition of this case. We must, therefore, decide whether and to what extent the First Amendment's protection of anonymity encompasses documents intended to influence the electoral process.

Ohio places its principal reliance on cases such as *Anderson* v. *Celebrezze,* 460 U. S. 780 (1983); *Storer* v. *Brown,* 415 U. S. 724 (1974); and *Burdick* v. *Takushi,* 504 U. S. 428 (1992), in which we reviewed election code provisions governing the voting process itself. See *Anderson, supra* (filing deadlines); *Storer, supra* (ballot access); *Burdick, supra* (write-in voting); see also *Tashjian* v. *Republican Party of Conn.,* 479 U. S. 208 (1986) (eligibility of independent voters to vote in party primaries). In those cases we refused to adopt "any

material of that character. But the ordinance is not so limited, and I think it will not do for the State simply to say that the circulation of all anonymous handbills must be suppressed in order to identify the distributors of those that may be of an obnoxious character. In the absence of a more substantial showing as to Los Angeles' actual experience with the distribution of obnoxious handbills, such a generality is for me too remote to furnish a constitutionally acceptable justification for the deterrent effect on free speech which this all-embracing ordinance is likely to have." 362 U. S., at 66–67 (footnote omitted).

'litmus-paper test' that will separate valid from invalid restrictions." *Anderson,* 460 U. S., at 789, quoting *Storer,* 415 U. S., at 730. Instead, we pursued an analytical process comparable to that used by courts "in ordinary litigation": We considered the relative interests of the State and the injured voters, and we evaluated the extent to which the State's interests necessitated the contested restrictions. *Anderson,* 460 U. S., at 789. Applying similar reasoning in this case, the Ohio Supreme Court upheld § 3599.09(A) as a *"reasonable"* and *"nondiscriminatory"* burden on the rights of voters. 67 Ohio St. 3d, at 396, 618 N. E. 2d, at 155, quoting *Anderson,* 460 U. S., at 788.

The "ordinary litigation" test does not apply here. Unlike the statutory provisions challenged in *Storer* and *Anderson,* § 3599.09(A) of the Ohio Code does not control the mechanics of the electoral process. It is a regulation of pure speech. Moreover, even though this provision applies evenhandedly to advocates of differing viewpoints,[8] it is a direct regulation of the content of speech. Every written document covered by the statute must contain "the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor." Ohio Rev. Code Ann. § 3599.09(A) (1988). Furthermore, the category of covered documents is defined by their content—only those publications containing speech designed to influence the voters in an election need bear the required markings.[9] *Ibid.* Consequently, we are not faced with an ordinary election restric-

---

[8] Arguably, the disclosure requirement places a more significant burden on advocates of unpopular causes than on defenders of the status quo. For purposes of our analysis, however, we assume the statute evenhandedly burdens all speakers who have a legitimate interest in remaining anonymous.

[9] Covered documents are those "designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election . . . ." § 3599.09(A).

tion; this case "involves a limitation on political expression subject to exacting scrutiny." *Meyer* v. *Grant*, 486 U. S. 414, 420 (1988).[10]

Indeed, as we have explained on many prior occasions, the category of speech regulated by the Ohio statute occupies the core of the protection afforded by the First Amendment:

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' *Roth* v. *United States*, 354 U. S. 476, 484 (1957). Although First Amendment protections are not confined to 'the exposition of ideas,' *Winters* v. *New York*, 333 U. S. 507, 510 (1948), 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates . . . .' *Mills* v. *Alabama*, 384 U. S. 214, 218 (1966). This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964). In a republic where the people are sovereign, the ability of the citi-

---

[10] In *Meyer*, we unanimously applied strict scrutiny to invalidate an election-related law making it illegal to pay petition circulators for obtaining signatures to place an initiative on the state ballot. Similarly, in *Burson* v. *Freeman*, 504 U. S. 191 (1992), although the law at issue— forbidding campaign-related speech within 100 feet of the entrance to a polling place—was an election-related restriction, both the plurality and dissent applied strict scrutiny because the law was "a facially content-based restriction on political speech in a public forum." *Id.*, at 198; see also *id.*, at 212–213 (KENNEDY, J., concurring); *id.*, at 217 (STEVENS, J., dissenting).

zenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co.* v. *Roy,* 401 U. S. 265, 272 (1971), 'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *Buckley* v. *Valeo,* 424 U. S. 1, 14–15 (1976) *(per curiam).*

Of course, core political speech need not center on a candidate for office. The principles enunciated in *Buckley* extend equally to issue-based elections such as the school tax referendum that Mrs. McIntyre sought to influence through her handbills. See *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 776–777 (1978) (speech on income tax referendum "is at the heart of the First Amendment's protection"). Indeed, the speech in which Mrs. McIntyre engaged—handing out leaflets in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression. See *International Soc. for Krishna Consciousness, Inc.* v. *Lee,* 505 U. S. 672 (1992); *Lovell* v. *City of Griffin,* 303 U. S. 444 (1938). That this advocacy occurred in the heat of a controversial referendum vote only strengthens the protection afforded to Mrs. McIntyre's expression: Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed. See *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949). No form of speech is entitled to greater constitutional protection than Mrs. McIntyre's.

When a law burdens core political speech, we apply "exacting scrutiny," and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest. See, *e. g., Bellotti,* 435 U. S., at 786. Our precedents thus make abundantly clear that the Ohio Supreme Court applied a significantly more lenient standard than is appropriate in a case of this kind.

## IV

Nevertheless, the State argues that, even under the strictest standard of review, the disclosure requirement in § 3599.09(A) is justified by two important and legitimate state interests. Ohio judges its interest in preventing fraudulent and libelous statements and its interest in providing the electorate with relevant information to be sufficiently compelling to justify the anonymous speech ban. These two interests necessarily overlap to some extent, but it is useful to discuss them separately.

Insofar as the interest in informing the electorate means nothing more than the provision of additional information that may either buttress or undermine the argument in a document, we think the identity of the speaker is no different from other components of the document's content that the author is free to include or exclude.[11] We have already held that the State may not compel a newspaper that prints editorials critical of a particular candidate to provide space for a reply by the candidate. *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974). The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit. Moreover, in the case of a handbill written by a private citizen who is not known to the recipient, the name and address of the author add little, if anything, to the reader's ability to evaluate the

---

[11] "Of course, the identity of the source is helpful in evaluating ideas. But 'the best test of truth is the power of the thought to get itself accepted in the competition of the market' (*Abrams* v. *United States,* [250 U. S. 616, 630 (1919) (Holmes, J., dissenting)]). Don't underestimate the common man. People are intelligent enough to evaluate the source of an anonymous writing. They can see it is anonymous. They know it is anonymous. They can evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message. And then, once they have done so, it is for them to decide what is 'responsible', what is valuable, and what is truth." *New York* v. *Duryea,* 76 Misc. 2d 948, 966–967, 351 N. Y. S. 2d 978, 996 (1974) (striking down similar New York statute as overbroad).

document's message. Thus, Ohio's informational interest is plainly insufficient to support the constitutionality of its disclosure requirement.

The state interest in preventing fraud and libel stands on a different footing. We agree with Ohio's submission that this interest carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large. Ohio does not, however, rely solely on § 3599.09(A) to protect that interest. Its Election Code includes detailed and specific prohibitions against making or disseminating false statements during political campaigns. Ohio Rev. Code Ann. §§ 3599.09.1(B), 3599.09.2(B) (1988). These regulations apply both to candidate elections and to issue-driven ballot measures.[12] Thus,

---

[12] Section 3599.09.1(B) provides:

"No person, during the course of any campaign for nomination or election to public office or office of a political party, by means of campaign materials, including sample ballots, an advertisement on radio or television or in a newspaper or periodical, a public speech, press release, or otherwise, shall knowingly and with intent to affect the outcome of such campaign do any of the following:

"(1) Use the title of an office not currently held by a candidate in a manner that implies that the candidate does currently hold that office or use the term 're-elect' when the candidate has never been elected at a primary, general, or special election to the office for which he is a candidate;

"(2) Make a false statement concerning the formal schooling or training completed or attempted by a candidate; a degree, diploma, certificate, scholarship, grant, award, prize, or honor received, earned, or held by a candidate; or the period of time during which a candidate attended any school, college, community technical school, or institution;

"(3) Make a false statement concerning the professional, occupational, or vocational licenses held by a candidate, or concerning any position the candidate held for which he received a salary or wages;

"(4) Make a false statement that a candidate or public official has been indicted or convicted of a theft offense, extortion, or other crime involving financial corruption or moral turpitude;

"(5) Make a statement that a candidate has been indicted for any crime or has been the subject of a finding by the Ohio elections commission without disclosing the outcome of any legal proceedings resulting from the indictment or finding;

Ohio's prohibition of anonymous leaflets plainly is not its principal weapon against fraud.[13] Rather, it serves as an aid to enforcement of the specific prohibitions and as a deterrent

"(6) Make a false statement that a candidate or official has a record of treatment or confinement for mental disorder;

"(7) Make a false statement that a candidate or official has been subjected to military discipline for criminal misconduct or dishonorably discharged from the armed services;

"(8) Falsely identify the source of a statement, issue statements under the name of another person without authorization, or falsely state the endorsement of or opposition to a candidate by a person or publication;

"(9) Make a false statement concerning the voting record of a candidate or public official;

"(10) Post, publish, circulate, distribute, or otherwise disseminate a false statement, either knowing the same to be false or with reckless disregard of whether it was false or not, concerning a candidate that is designed to promote the election, nomination, or defeat of the candidate. As used in this section, 'voting record' means the recorded 'yes' or 'no' vote on a bill, ordinance, resolution, motion, amendment, or confirmation."

Section 3599.09.2(B) provides:

"No person, during the course of any campaign in advocacy of or in opposition to the adoption of any ballot proposition or issue, by means of campaign material, including sample ballots, an advertisement on radio or television or in a newspaper or periodical, a public speech, a press release, or otherwise, shall knowingly and with intent to affect the outcome of such campaign do any of the following:

"(1) Falsely identify the source of a statement, issue statements under the name of another person without authorization, or falsely state the endorsement of or opposition to a ballot proposition or issue by a person or publication;

"(2) Post, publish, circulate, distribute, or otherwise disseminate, a false statement, either knowing the same to be false or acting with reckless disregard of whether it was false or not, that is designed to promote the adoption or defeat of any ballot proposition or issue." § 3599.09.2(B).

We need not, of course, evaluate the constitutionality of these provisions. We quote them merely to emphasize that Ohio has addressed directly the problem of election fraud. To the extent the anonymity ban indirectly seeks to vindicate the same goals, it is merely a supplement to the above provisions.

[13] The same can be said with regard to "libel," as many of the above-quoted Election Code provisions prohibit false statements about candidates. To the extent those provisions may be underinclusive, Ohio courts also

to the making of false statements by unscrupulous prevaricators. Although these ancillary benefits are assuredly legitimate, we are not persuaded that they justify § 3599.09(A)'s extremely broad prohibition.

As this case demonstrates, the prohibition encompasses documents that are not even arguably false or misleading. It applies not only to the activities of candidates and their organized supporters, but also to individuals acting independently and using only their own modest resources.[14] It applies not only to elections of public officers, but also to

enforce the common-law tort of defamation. See, e. g., *Varanese* v. *Gall*, 35 Ohio St. 3d 78, 518 N. E. 2d 1177 (1988) (applying the standard of *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), to an Ohio public official's state-law libel claim arising from an election-related advertisement). Like other forms of election fraud, then, Ohio directly attacks the problem of election-related libel; to the extent that the anonymity ban serves the same interest, it is merely a supplement.

[14] We stressed the importance of this distinction in *Buckley* v. *Valeo*, 424 U. S. 1, 37 (1976):

"Treating these expenses [the expenses incurred by campaign volunteers] as contributions when made to the candidate's campaign or at the direction of the candidate or his staff forecloses an avenue of abuse without limiting actions voluntarily undertaken by citizens independently of a candidate's campaign." (Footnote omitted.)

Again, in striking down the independent expenditure limitations of the Federal Election Campaign Act of 1971, 18 U. S. C. § 608(e)(1) (1970 ed., Supp. IV) (repealed 1976), we distinguished another section of the statute (§ 608(b), which we upheld) that placed a ceiling on contributions to a political campaign.

"By contrast, § 608(e)(1) limits expenditures for express advocacy of candidates made totally independently of the candidate and his campaign. Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate. Rather than preventing circumvention of the contribution limitations, § 608(e)(1) severely restricts all independent advocacy despite its substantially diminished potential for abuse." 424 U. S., at 47.

ballot issues that present neither a substantial risk of libel nor any potential appearance of corrupt advantage.[15] It applies not only to leaflets distributed on the eve of an election, when the opportunity for reply is limited, but also to those distributed months in advance.[16] It applies no matter what the character or strength of the author's interest in anonymity. Moreover, as this case also demonstrates, the absence of the author's name on a document does not necessarily protect either that person or a distributor of a forbidden document from being held responsible for compliance with the Election Code. Nor has the State explained why it can

---

[15] "The risk of corruption perceived in cases involving candidate elections, *e. g., United States* v. *Automobile Workers,* [352 U. S. 567 (1957)]; *United States* v. *CIO,* [335 U. S. 106 (1948)], simply is not present in a popular vote on a public issue." *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 790 (1978) (footnote omitted).

[16] As the Illinois Supreme Court explained in *People* v. *White,* 116 Ill. 2d 171, 180, 506 N. E. 2d 1284, 1288 (Ill. 1987), which struck down a similar statute:

"Implicit in the State's . . . justification is the concern that the public could be misinformed and an election swayed on the strength of an eleventh-hour anonymous smear campaign to which the candidate could not meaningfully respond. The statute cannot be upheld on this ground, however, because it sweeps within its net a great deal of anonymous speech completely unrelated to this concern. In the first place, the statute has no time limit and applies to literature circulated two months prior to an election as well as that distributed two days before. The statute also prohibits anonymous literature supporting or opposing not only candidates, but also referenda. A public question clearly cannot be the victim of character assassination."

The temporal breadth of the Ohio statute also distinguishes it from the Tennessee law that we upheld in *Burson* v. *Freeman,* 504 U. S. 191 (1992). The Tennessee statute forbade electioneering within 100 feet of the entrance to a polling place. It applied only on election day. The State's interest in preventing voter intimidation and election fraud was therefore enhanced by the need to prevent last-minute misinformation to which there is no time to respond. Moreover, Tennessee geographically confined the reach of its law to a 100-foot no-solicitation zone. By contrast, the Ohio law forbids anonymous campaign speech wherever it occurs.

more easily enforce the direct bans on disseminating false documents against anonymous authors and distributors than against wrongdoers who might use false names and addresses in an attempt to avoid detection. We recognize that a State's enforcement interest might justify a more limited identification requirement, but Ohio has shown scant cause for inhibiting the leafletting at issue here.

## V

Finally, Ohio vigorously argues that our opinions in *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978), and *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, amply support the constitutionality of its disclosure requirement. Neither case is controlling: The former concerned the scope of First Amendment protection afforded to corporations; the relevant portion of the latter concerned mandatory disclosure of campaign-related expenditures. Neither case involved a prohibition of anonymous campaign literature.

In *Bellotti*, we reversed a judgment of the Supreme Judicial Court of Massachusetts sustaining a state law that prohibited corporate expenditures designed to influence the vote on referendum proposals. 435 U. S. 765. The Massachusetts court had held that the First Amendment protects corporate speech only if its message pertains directly to the business interests of the corporation. *Id.*, at 771–772. Consistently with our holding today, we noted that the "inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." *Id.*, at 777. We also made it perfectly clear that we were not deciding whether the First Amendment's protection of corporate speech is coextensive with the protection it affords to individuals.[17] Accordingly, although we commented in dicta

---

[17] "In deciding whether this novel and restrictive gloss on the First Amendment comports with the Constitution and the precedents of this Court, we need not survey the outer boundaries of the Amendment's pro-

on the prophylactic effect of requiring identification of the source of corporate advertising,[18] that footnote did not necessarily apply to independent communications by an individual like Mrs. McIntyre.

Our reference in the *Bellotti* footnote to the "prophylactic effect" of disclosure requirements cited a portion of our earlier opinion in *Buckley,* in which we stressed the importance of providing "the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate.'" 424 U. S., at 66. We observed that the "sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office." *Id.,* at 67. Those comments concerned contributions to the candidate or expenditures authorized by the candidate or his responsible agent. They had no reference to the kind of independent activity pursued by Mrs. McIntyre. Required disclosures about the level of financial support a candidate has received from various sources are supported by an interest in avoiding the appearance of corruption that has no application to this case.

---

tection of corporate speech, or address the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment." *Bellotti,* 435 U. S., at 777–778.

In a footnote to that passage, we continued:

"Nor is there any occasion to consider in this case whether, under different circumstances, a justification for a restriction on speech that would be inadequate as applied to individuals might suffice to sustain the same restriction as applied to corporations, unions, or like entities." *Id.,* at 777–778, n. 13.

[18] "Corporate advertising, unlike some methods of participation in political campaigns, is likely to be highly visible. Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected. See *Buckley,* 424 U. S., at 66–67; *United States* v. *Harriss,* 347 U. S. 612, 625–626 (1954). In addition, we emphasized in *Buckley* the prophylactic effect of requiring that the source of communication be disclosed. 424 U. S., at 67." *Id.,* at 792, n. 32.

True, in another portion of the *Buckley* opinion we expressed approval of a requirement that even "independent expenditures" in excess of a threshold level be reported to the Federal Election Commission. *Id.*, at 75–76. But that requirement entailed nothing more than an identification to the Commission of the amount and use of money expended in support of a candidate. See *id.*, at 157–159, 160 (reproducing relevant portions of the statute[19]). Though such mandatory reporting undeniably impedes protected First Amendment activity, the intrusion is a far cry from compelled self-identification on all election-related writings. A written election-related document—particularly a leaflet—is often a personally crafted statement of a political viewpoint. Mrs. McIntyre's handbills surely fit that description. As such, identification of the author against her will is particularly intrusive; it reveals unmistakably the content of her thoughts on a controversial issue. Disclosure of an expenditure and its use, without more, reveals far less information. It may be information that a person prefers to keep secret, and undoubtedly it often gives away something about the spender's political views. Nonetheless, even though money may "talk," its speech is less specific, less personal, and less provocative than a handbill—and as a result, when money supports an unpopular viewpoint it is less likely to precipitate retaliation.

---

[19] One of those provisions, addressing contributions by campaign committees, required:

"the identification of each person to whom expenditures have been made by such committee or on behalf of such committee or candidate within the calendar year in an aggregate amount or value in excess of $100, the amount, date, and purpose of each such expenditure and the name and address of, and office sought by, each candidate on whose behalf such expenditure was made." 2 U. S. C. § 434(b)(9) (1970 ed., Supp. IV) (reprinted in *Buckley*, 424 U. S., at 158).

A separate provision, 2 U. S. C. § 434(e) (1970 ed., Supp. IV) (reprinted in *Buckley*, 424 U. S., at 160), required individuals making contributions or expenditures to file statements containing the same information.

Not only is the Ohio statute's infringement on speech more intrusive than the *Buckley* disclosure requirement, but it rests on different and less powerful state interests. The Federal Election Campaign Act of 1971, at issue in *Buckley,* regulates only candidate elections, not referenda or other issue-based ballot measures; and we construed "independent expenditures" to mean only those expenditures that "expressly advocate the election or defeat of a clearly identified candidate." *Id.,* at 80. In candidate elections, the Government can identify a compelling state interest in avoiding the corruption that might result from campaign expenditures. Disclosure of expenditures lessens the risk that individuals will spend money to support a candidate as a *quid pro quo* for special treatment after the candidate is in office. Curriers of favor will be deterred by the knowledge that all expenditures will be scrutinized by the Federal Election Commission and by the public for just this sort of abuse.[20] Moreover, the federal Act contains numerous legitimate disclosure requirements for campaign organizations; the similar requirements for independent expenditures serve to ensure that a campaign organization will not seek to evade disclosure by routing its expenditures through individual supporters. See *Buckley,* 424 U. S., at 76. In short, although *Buckley* may permit a more narrowly drawn statute, it surely is not authority for upholding Ohio's open-ended provision.[21]

---

[20] This interest also serves to distinguish *United States* v. *Harriss,* 347 U. S. 612 (1954), in which we upheld limited disclosure requirements for lobbyists. The activities of lobbyists who have direct access to elected representatives, if undisclosed, may well present the appearance of corruption.

[21] We note here also that the federal Act, while constitutional on its face, may not be constitutional in all its applications. Cf. *Brown* v. *Socialist Workers '74 Campaign Comm. (Ohio),* 459 U. S. 87, 88 (1982) (holding Ohio disclosure requirements unconstitutional as applied to "a minor political

## VI

Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority. See generally J. Mill, On Liberty and Considerations on Representative Government 1, 3–4 (R. McCallum ed. 1947). It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse. See *Abrams* v. *United States*, 250 U. S. 616, 630–631 (1919) (Holmes, J., dissenting). Ohio has not shown that its interest in preventing the misuse of anonymous election-related speech justifies a prohibition of all uses of that speech. The State may, and does, punish fraud directly. But it cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented. One would be hard pressed to think of a better example of the pitfalls of Ohio's blunderbuss approach than the facts of the case before us.

The judgment of the Ohio Supreme Court is reversed.

*It is so ordered.*

---

party which historically has been the object of harassment by government officials and private parties"); *Buckley,* 424 U. S., at 74 (exempting minor parties from disclosure requirements if they can show "a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties").

JUSTICE GINSBURG, concurring.

The dissent is stirring in its appreciation of democratic values. But I do not see the Court's opinion as unguided by "bedrock principle," tradition, or our case law. See *post*, at 375–378, 378–380. Margaret McIntyre's case, it seems to me, bears a marked resemblance to Margaret Gilleo's case[1] and Mary Grace's.[2] All three decisions, I believe, are sound, and hardly sensational, applications of our First Amendment jurisprudence.

In for a calf is not always in for a cow. The Court's decision finds unnecessary, overintrusive, and inconsistent with American ideals the State's imposition of a fine on an individual leafleteer who, within her local community, spoke her mind, but sometimes not her name. We do not thereby hold that the State may not in other, larger circumstances require the speaker to disclose its interest by disclosing its identity. Appropriately leaving open matters not presented by McIntyre's handbills, the Court recognizes that a State's interest in protecting an election process "might justify a more limited identification requirement." *Ante*, at 353. But the Court has convincingly explained why Ohio lacks "cause for inhibiting the leafletting at issue here." *Ibid.*

JUSTICE THOMAS, concurring in the judgment.

I agree with the majority's conclusion that Ohio's election law, Ohio Rev. Code Ann. § 3599.09(A) (1988), is inconsistent with the First Amendment. I would apply, however, a dif-

---

[1] See *City of Ladue* v. *Gilleo*, 512 U. S. 43 (1994), in which we held that the city of Ladue could not prohibit homeowner Gilleo's display of a small sign, on her lawn or in a window, opposing war in the Persian Gulf.

[2] Grace was the "lone picketer" who stood on the sidewalk in front of this Court with a sign containing the text of the First Amendment, prompting us to exclude public sidewalks from the statutory ban on display of a "flag, banner, or device" on Court grounds. *United States* v. *Grace*, 461 U. S. 171, 183 (1983).

ferent methodology to this case. Instead of asking whether "an honorable tradition" of anonymous speech has existed throughout American history, or what the "value" of anonymous speech might be, we should determine whether the phrase "freedom of speech, or of the press," as originally understood, protected anonymous political leafletting. I believe that it did.

I

The First Amendment states that the government "shall make no law . . . abridging the freedom of speech, or of the press." U. S. Const., Amdt. 1. When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now." *South Carolina* v. *United States,* 199 U. S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions . . . in the several states." *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 721 (1838). See also *INS* v. *Chadha,* 462 U. S. 919, 959 (1983). We should seek the original understanding when we interpret the Speech and Press Clauses, just as we do when we read the Religion Clauses of the First Amendment. When the Framers did not discuss the precise question at issue, we have turned to "what history reveals was the contemporaneous understanding of [the Establishment Clause's] guarantees." *Lynch* v. *Donnelly,* 465 U. S. 668, 673 (1984). "[T]he line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers." *School Dist. of Abington Township* v. *Schempp,* 374 U. S. 203, 294 (1963) (Brennan, J., concurring); see also *Lee* v. *Weisman,* 505 U. S. 577, 632–633 (1992) (SCALIA, J., dissenting).

## II

Unfortunately, we have no record of discussions of anonymous political expression either in the First Congress, which drafted the Bill of Rights, or in the state ratifying conventions. Thus, our analysis must focus on the practices and beliefs held by the Founders concerning anonymous political articles and pamphlets. As an initial matter, we can safely maintain that the leaflets at issue in this case implicate the freedom of the press. When the Framers thought of the press, they did not envision the large, corporate newspaper and television establishments of our modern world. Instead, they employed the term "the press" to refer to the many independent printers who circulated small newspapers or published writers' pamphlets for a fee. See generally B. Bailyn & J. Hench, The Press & the American Revolution (1980); L. Levy, Emergence of a Free Press (1985); B. Bailyn, The Ideological Origins of the American Revolution (1967). "It was in this form—as pamphlets—that much of the most important and characteristic writing of the American Revolution occurred." 1 B. Bailyn, Pamphlets of the American Revolution 3 (1965). This practice continued during the struggle for ratification. See, e. g., Pamphlets on the Constitution of the United States (P. Ford ed. 1888). Regardless of whether one designates the right involved here as one of press or one of speech, however, it makes little difference in terms of our analysis, which seeks to determine only whether the First Amendment, as originally understood, protects anonymous writing.

There is little doubt that the Framers engaged in anonymous political writing. The essays in the Federalist Papers, published under the pseudonym of "Publius," are only the most famous example of the outpouring of anonymous political writing that occurred during the ratification of the Constitution. Of course, the simple fact that the Framers engaged in certain conduct does not necessarily prove that they forbade its prohibition by the government. See *post*, at 373

(SCALIA, J., dissenting).   In this case, however, the historical evidence indicates that Founding-era Americans opposed attempts to require that anonymous authors reveal their identities on the ground that forced disclosure violated the "freedom of the press."

For example, the earliest and most famous American experience with freedom of the press, the 1735 Zenger trial, centered around anonymous political pamphlets.   The case involved a printer, John Peter Zenger, who refused to reveal the anonymous authors of published attacks on the Crown Governor of New York.   When the Governor and his council could not discover the identity of the authors, they prosecuted Zenger himself for seditious libel.   See J. Alexander, A Brief Narrative of the Case and Trial of John Peter Zenger 9–19 (S. Katz ed. 1972).   Although the case set the Colonies afire for its example of a jury refusing to convict a defendant of seditious libel against Crown authorities, it also signified at an early moment the extent to which anonymity and the freedom of the press were intertwined in the early American mind.

During the Revolutionary and Ratification periods, the Framers' understanding of the relationship between anonymity and freedom of the press became more explicit.   In 1779, for example, the Continental Congress attempted to discover the identity of an anonymous article in the Pennsylvania Packet signed by the name "Leonidas."   Leonidas, who actually was Dr. Benjamin Rush, had attacked the Members of Congress for causing inflation throughout the States and for engaging in embezzelment and fraud.   13 Letters of Delegates to Congress 1774–1789, p. 141, n. 1 (G. Gawalt & R. Gephart eds. 1986).   Elbridge Gerry, a delegate from Massachusetts, moved to haul the printer of the newspaper before Congress to answer questions concerning Leonidas. Several Members of Congress then rose to oppose Gerry's motion on the ground that it invaded the freedom of the press.   Merriweather Smith of Virginia rose, quoted from

the offending article with approval, and then finished with a declaration that "[w]hen the liberty of the Press shall be restrained . . . the liberties of the People will be at an end." Henry Laurens, Notes of Debates, July 3, 1779, *id.*, at 139. Supporting Smith, John Penn of North Carolina argued that the writer "no doubt had *good designs*," and that "[t]he liberty of the Press ought not to be restrained." *Ibid.* In the end, these arguments persuaded the assembled delegates, who "sat mute" in response to Gerry's motion. *Id.*, at 141. Neither the printer nor Dr. Rush ever appeared before Congress to answer for their publication. D. Teeter, Press Freedom and the Public Printing: Pennsylvania, 1775–83, 45 Journalism Q. 445, 451 (1968).

At least one of the state legislatures shared Congress' view that the freedom of the press protected anonymous writing. Also in 1779, the upper house of the New Jersey State Legislature attempted to punish the author of a satirical attack on the Governor and the College of New Jersey (now Princeton) who had signed his work "Cincinnatus." R. Hixson, Isaac Collins: A Quaker Printer in 18th Century America 95 (1968). Attempting to enforce the crime of seditious libel, the State Legislative Council ordered Isaac Collins—the printer and editor of the newspaper in which the article had appeared—to reveal the author's identity. Refusing, Collins declared: "'Were I to comply . . . I conceive I should betray the trust reposed in me, and be far from acting as a faithful guardian of the Liberty of the Press.'" *Id.*, at 96. Apparently, the State Assembly agreed that anonymity was protected by the freedom of the press, as it voted to support the editor and publisher by frustrating the council's orders. *Id.*, at 95.

By 1784, the same Governor of New Jersey, William Livingston, was at work writing anonymous articles that defended the right to publish anonymously as part of the freedom of the press. Under the pseudonym "Scipio,"

Livingston wrote several articles attacking the legislature's failure to lower taxes, and he accused a state officer of stealing or losing state funds during the British invasion of New Jersey. *Id.*, at 107–109; Scipio, Letter to the Printer, Feb. 24, 1784, The New-Jersey Gazette. Responding to the allegations, the officer called upon Scipio "to avow your publication, give up your real name." S. Tucker, To Scipio, Mar. 2, 1784, The New-Jersey Gazette. Livingston replied with a four-part series defending "the Liberty of the Press." Although Livingston at first defended anonymity because it encouraged authors to discuss politics without fear of reprisal, he ultimately invoked the liberty of the press as the guardian for anonymous political writing. "I hope [Tucker] is not seriously bent upon a total subversion of our political system," Scipio wrote. "And pray may not a man, in a free country, convey thro' the press his sentiments on publick grievances . . . without being obliged to send a certified copy of the *baptismal register* to prove his name." Scipio, On the Liberty of the Press IV, Apr. 26, 1784, The New-Jersey Gazette.

To be sure, there was some controversy among newspaper editors over publishing anonymous articles and pamphlets. But this controversy was resolved in a manner that indicates that the freedom of the press protected an author's anonymity. The tempest began when a Federalist, writing anonymously himself, expressed fear that "emissaries" of "foreign enemies" would attempt to scuttle the Constitution by "fill-[ing] the press with objections" against the proposal. Boston Independent Chronicle, Oct. 4, 1787, in 13 Documentary History of the Ratification of the Constitution 315 (J. Kaminski & G. Saladino eds. 1981) (hereinafter Documentary History). He called upon printers to refrain from publishing when the author "chooses to remain concealed." *Ibid.* Benjamin Russell, the editor of the prominent Federalist newspaper the Massachusetts Centinel, immediately adopted a policy of refusing to publish Anti-Federalist pieces unless the

author provided his identity to be "handed to the publick, if required." Massachusetts Centinel, Oct. 10, 1787, *id.*, at 312, 315–316. A few days later, the Massachusetts Gazette announced that it would emulate the example set by the Massachusetts Centinel. Massachusetts Gazette, Oct. 16, 1787, *id.*, at 317. In the same issue, the Gazette carried an article claiming that requiring an anonymous writer to leave his name with the printer, so that anyone who wished to know his identity could be informed, "appears perfectly reasonable, and is perfectly consistent with the liberty of the press." A Citizen, Massachusetts Gazette, Oct. 16, 1787, *id.*, at 316. Federalists expressed similar thoughts in Philadelphia. See A Philadelphia Mechanic, Philadelphia Independent Gazetteer, Oct. 29, 1787, *id.*, at 318–319; Galba, Philadelphia Independent Gazetteer, Oct. 31, 1787, *id.*, at 319. The Jewel, Philadelphia Independent Gazetteer, Nov. 2, 1787, *id.*, at 320.

Ordinarily, the fact that some founding-era editors as a matter of policy decided not to publish anonymous articles would seem to shed little light upon what the Framers thought the *government* could do. The widespread criticism raised by the Anti-Federalists, however, who were the driving force behind the demand for a Bill of Rights, indicates that they believed the freedom of the press to include the right to author anonymous political articles and pamphlets.[1] That most other Americans shared this understanding is reflected in the Federalists' hasty retreat before the withering criticism of their assault on the liberty of the press.

Opposition to Russell's declaration centered in Philadelphia. Three Philadelphia papers published the "Citizen" piece that had run in the Massachusetts Gazette. *Id.*, at

---

[1] The Anti-Federalists recognized little difficulty in what today would be a state-action problem, because they considered Federalist conduct in supporting the Constitution as a preview of the tyranny to come under the new Federal Government.

318–320.[2]   In response, one of the leading Anti-Federalist writers, the "Federal Farmer," attacked Russell's policy: "What can be the views of those gentlemen in Boston, who countenanced the Printers in shutting up the press against a fair and free investigation of this important system in the usual way?"   Letters From the Federal Farmer No. 5, Oct. 13, 1787, in 2 The Complete Anti-Federalist 254 (H. Storing ed. 1981).   Another Anti-Federalist, "Philadelphiensis," also launched a substantial attack on Russell and his defenders for undermining the freedom of the press.   "In this desperate situation of affairs . . . the friends of this despotic scheme of government, were driven to the last and only alternative from which there was any probability of success; namely, the abolition of *the freedom of the Press.*"   Philadelphiensis, Essay I, Independent Gazetteer, Nov. 7, 1787, 3 *id.*, at 102. In Philadelphiensis' eyes, Federalist attempts to suppress the Anti-Federalist press by requiring the disclosure of authors' identities only foreshadowed the oppression permitted by the new Constitution.   "Here we see pretty plainly through [the Federalists'] excellent regulation of the press, how things are to be carried on after the adoption of the new constitution."   *Id.*, at 103.   According to Philadelphiensis, Federalist policies had already ruined freedom in Massachusetts: "In Boston the liberty of the press is now completely abolished; and hence all other privileges and rights of the people will in a short time be destroyed."   *Id.*, at 104.

Not limited to Philadelphia, the Anti-Federalist attack was repeated widely throughout the States.   In New York, one writer exclaimed that the Federalist effort to suppress ano-

---

[2] As noted earlier, several pieces in support appeared in the Federalist newspaper, the Philadelphia Independent Gazetteer.   They were immediately answered by two Anti-Federalists in the Philadelphia Freeman's Journal.   These Anti-Federalists accused the Federalists of "preventing that freedom of enquiry which truth and honour never dreads, but which tyrants and tyranny could never endure."   13 Documentary History 317–318.

nymity would "REVERSE the important doctrine *of the freedom of the press*," whose "truth" was "universally acknowledged." Detector, New York Journal, Oct. 25, 1787, in 13 Documentary History 318. "Detector" proceeded to proclaim that Russell's policy was "the introduction of this first trait of slavery into your country!" *Ibid.* Responding to the Federalist editorial policy, a Rhode Island Anti-Federalist wrote: "The Liberty of the Press, or the Liberty which *every Person* in the United States *at present* enjoys . . . is a Privilege of infinite Importance . . . for which . . . we have fought and bled," and that the attempt by "our aristocratical Gentry, to have every Person's Name published who should write against the proposed Federal Constitution, has given many of us a just Alarm." Argus, Providence United States Chronicle, Nov. 8, 1787, *id.*, at 320–321. Edward Powars, editor of the Anti-Federalist Boston American Herald, proclaimed that *his* pages would remain "FREE and OPEN to all parties." Boston American Herald, Oct. 15, 1787, *id.*, at 316. In the Boston Independent Chronicle of Oct. 18, 1787, "Solon" accused Russell of attempting to undermine a "*freedom* and *independence* of *sentiments*" which "should never be *checked* in a *free* country" and was "so *essential* to the *existance* of free Governments." *Id.*, at 313.

The controversy over Federalist attempts to prohibit anonymous political speech is significant for several reasons. First, the Anti-Federalists clearly believed the right to author and publish anonymous political articles and pamphlets was protected by the liberty of the press. Second, although printers' editorial policies did not constitute state action, the Anti-Federalists believed that the Federalists were merely flexing the governmental powers they would fully exercise upon the Constitution's ratification. Third, and perhaps most significantly, it appears that the Federalists agreed with the Anti-Federalist critique. In Philadelphia, where opposition to the ban was strongest, there is no record that any newspaper adopted the nonanonymity policy, nor that of

any city or State aside from Russell's Massachusetts Centinel and the Federalist Massachusetts Gazette. Moreover, these two papers' bark was worse than their bite. In the face of widespread criticism, it appears that Russell retreated from his policy and, as he put it, "'readily'" reprinted several anonymous Federalist and Anti-Federalist essays to show that claims that he had suppressed freedom of the press "'had not any foundation in truth.'" 13 Documentary History 313–314. Likewise, the Massachusetts Gazette refused to release the names of Anti-Federalist writers when requested. *Ibid.* When Federalist attempts to ban anonymity are followed by a sharp, widespread Anti-Federalist defense in the name of the freedom of the press, and then by an open Federalist retreat on the issue, I must conclude that both Anti-Federalists and Federalists believed that the freedom of the press included the right to publish without revealing the author's name.

### III

The historical record is not as complete or as full as I would desire. For example, there is no evidence that, after the adoption of the First Amendment, the Federal Government attempted to require writers to attach their names to political documents. Nor do we have any indication that the federal courts of the early Republic would have squashed such an effort as a violation of the First Amendment. The understanding described above, however, when viewed in light of the Framers' universal practice of publishing anonymous articles and pamphlets, indicates that the Framers shared the belief that such activity was firmly part of the freedom of the press. It is only an innovation of modern times that has permitted the regulation of anonymous speech.

The large quantity of newspapers and pamphlets the Framers produced during the various crises of their generation show the remarkable extent to which the Framers relied upon anonymity. During the break with Great Britain, the

revolutionaries employed pseudonyms both to conceal their identity from Crown authorities and to impart a message. Often, writers would choose names to signal their point of view or to invoke specific classical and modern "crusaders in an agelong struggle against tyranny." A. Schlesinger, Prelude to Independence 35 (1958). Thus, leaders of the struggle for independence would adopt descriptive names such as "Common Sense," a "Farmer," or "A True Patriot," or historical ones such as "Cato" (a name used by many to refer to the Roman Cato and to Cato's letters), or "Mucius Scaevola." Id., at xii–xiii. The practice was even more prevalent during the great outpouring of political argument and commentary that accompanied the ratification of the Constitution. Besides "Publius," prominent Federalists signed their articles and pamphlets with names such as "An American Citizen," "Marcus," "A Landholder," "Americanus"; Anti-Federalists replied with the pseudonyms "Cato," "Centinel," "Brutus," the "Federal Farmer," and "The Impartial Examiner." See generally 1–2 Debate on the Constitution (B. Bailyn ed. 1993). The practice of publishing one's thoughts anonymously or under pseudonym was so widespread that only two major Federalist or Anti-Federalist pieces appear to have been signed by their true authors, and they may have had special reasons to do so.[3]

If the practice of publishing anonymous articles and pamphlets fell into disuse after the Ratification, one might infer that the custom of anonymous political speech arose only in response to the unusual conditions of the 1776–1787 period.

---

[3] See Mason, Objections to the Constitution, Virginia Journal, Nov. 22, 1787, 1 Debate on the Constitution 345 (B. Bailyn ed. 1993); Martin, The Genuine Information, Maryland Gazette, Dec. 28, 1787–Feb. 8, 1788, id., at 631. Both men may have made an exception to the general practice because they both had attended the Philadelphia Convention, but had refused to sign the Constitution. As leaders of the fight against ratification, both men may have believed that they owed a personal explanation to their constituents of their decision not to sign.

After all, the Revolution and the Ratification were not "elections," *per se,* either for candidates or for discrete issues. Records from the first federal elections indicate, however, that anonymous political pamphlets and newspaper articles remained the favorite media for expressing views on candidates. In Pennsylvania, for example, writers for or against the Federalist and Anti-Federalist candidates wrote under the names "Numa," "Pompilius," "A Friend to Agriculture, Trade, and Good Laws," "A Federal Centinel," a "Freeman," "Centinel," "A Real Patriot to All True Federalists," "A Mechanic," "Justice," "A German Federalist," and so on. See generally 1 Documentary History of the First Federal Elections 1788–1790, pp. 246–362 (M. Jensen & R. Becker eds. 1976). This appears to have been the practice in all of the major States of which we have substantial records today. See 1 *id.,* at 446–464 (Massachusetts); 2 *id.,* at 108–122, 175–229 (Maryland); 2 *id.,* at 387–397 (Virginia); 3 *id.,* at 204–216, 436–493 (New York). It seems that actual names were used rarely, and usually only by candidates who wanted to explain their positions to the electorate.

The use of anonymous writing extended to issues as well as candidates. The ratification of the Constitution was not the only issue discussed via anonymous writings in the press. James Madison and Alexander Hamilton, for example, resorted to pseudonyms in the famous "Helvidius" and "Pacificus" debates over President Washington's declaration of neutrality in the war between the British and French. See Hamilton, Pacificus No. 1, June 29, 1793, in 15 Papers of Alexander Hamilton 33–43 (H. Syrett ed. 1969); Madison, Helvidius No. 1, Aug. 24, 1793, in 15 Papers of James Madison 66–73 (T. Mason, R. Rutland, J. Sisson eds. 1985). Anonymous writings continued in such Republican papers as the Aurora and Federalists organs such as the Gazette of the United States at least until the election of Thomas Jefferson. See generally J. Smith, Freedom's Fetters (1956).

## IV

This evidence leads me to agree with the majority's result, but not its reasoning. The majority fails to seek the original understanding of the First Amendment, and instead attempts to answer the question in this case by resorting to three approaches. First, the majority recalls the historical practice of anonymous writing from Shakespeare's works to the Federalist Papers to Mark Twain. *Ante*, at 341, and n. 4, 342–343, and n. 6, 357. Second, it finds that anonymous speech has an expressive value both to the speaker and to society that outweighs public interest in disclosure. Third, it finds that § 3599.09(A) cannot survive strict scrutiny because it is a "content-based" restriction on speech.

I cannot join the majority's analysis because it deviates from our settled approach to interpreting the Constitution and because it superimposes its modern theories concerning expression upon the constitutional text. Whether "great works of literature"—by Voltaire or George Eliot have been published anonymously should be irrelevant to our analysis, because it sheds no light on what the phrases "free speech" or "free press" meant to the people who drafted and ratified the First Amendment. Similarly, whether certain types of expression have "value" today has little significance; what *is* important is whether the Framers in 1791 believed anonymous speech sufficiently valuable to deserve the protection of the Bill of Rights. And although the majority faithfully follows our approach to "content-based" speech regulations, we need not undertake this analysis when the original understanding provides the answer.

While, like JUSTICE SCALIA, I am loath to overturn a century of practice shared by almost all of the States, I believe the historical evidence from the framing outweighs recent tradition. When interpreting other provisions of the Constitution, this Court has believed itself bound by the text of the Constitution and by the intent of those who drafted and ratified it. It should hold itself to no less a standard when

interpreting the Speech and Press Clauses. After reviewing the weight of the historical evidence, it seems that the Framers understood the First Amendment to protect an author's right to express his thoughts on political candidates or issues in an anonymous fashion. Because the majority has adopted an analysis that is largely unconnected to the Constitution's text and history, I concur only in the judgment.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins, dissenting.

At a time when both political branches of Government and both political parties reflect a popular desire to leave more decisionmaking authority to the States, today's decision moves in the opposite direction, adding to the legacy of inflexible central mandates (irrevocable even by Congress) imposed by this Court's constitutional jurisprudence. In an opinion which reads as though it is addressing some peculiar law like the Los Angeles municipal ordinance at issue in *Talley* v. *California*, 362 U. S. 60 (1960), the Court invalidates a species of protection for the election process that exists, in a variety of forms, in every State except California, and that has a pedigree dating back to the end of the 19th century. Preferring the views of the English utilitarian philosopher John Stuart Mill, *ante*, at 357, to the considered judgment of the American people's elected representatives from coast to coast, the Court discovers a hitherto unknown right-to-be-unknown while engaging in electoral politics. I dissent from this imposition of free-speech imperatives that are demonstrably not those of the American people today, and that there is inadequate reason to believe were those of the society that begat the First Amendment or the Fourteenth.

I

The question posed by the present case is not the easiest sort to answer for those who adhere to the Court's (and the

society's) traditional view that the Constitution bears its original meaning and is unchanging. Under that view, "[o]n every question of construction, [we should] carry ourselves back to the time when the Constitution was adopted; recollect the spirit manifested in the debates; and instead of trying [to find] what meaning may be squeezed out of the text, or invented against it, conform to the probable one in which it was passed." T. Jefferson, Letter to William Johnson (June 12, 1823), in 15 Writings of Thomas Jefferson 439, 449 (A. Lipscomb ed. 1904). That technique is simple of application when government conduct that is claimed to violate the Bill of Rights or the Fourteenth Amendment is shown, upon investigation, to have been engaged in without objection at the very time the Bill of Rights or the Fourteenth Amendment was adopted. There is no doubt, for example, that laws against libel and obscenity do not violate "the freedom of speech" to which the First Amendment refers; they existed and were universally approved in 1791. Application of the principle of an unchanging Constitution is also simple enough at the other extreme, where the government conduct at issue was *not* engaged in at the time of adoption, and there is ample evidence that the *reason* it was not engaged in is that it was thought to violate the right embodied in the constitutional guarantee. Racks and thumbscrews, well-known instruments for inflicting pain, were not in use because they were regarded as cruel punishments.

The present case lies between those two extremes. Anonymous electioneering was not prohibited by law in 1791 or in 1868. In fact, it was widely practiced at the earlier date, an understandable legacy of the revolutionary era in which political dissent could produce governmental reprisal. I need not dwell upon the evidence of that, since it is described at length in today's concurrence. See *ante*, at 360–369 (THOMAS, J., concurring in judgment). The practice of anonymous electioneering may have been less general in 1868,

when the Fourteenth Amendment was adopted, but at least as late as 1837 it was respectable enough to be engaged in by Abraham Lincoln. See 1 A. Beveridge, Abraham Lincoln 1809–1858, pp. 215–216 (1928); 1 Uncollected Works of Abraham Lincoln 155–161 (R. Wilson ed. 1947).

But to prove that anonymous electioneering was used frequently is not to establish that it is a constitutional right. Quite obviously, not every restriction upon expression that did not exist in 1791 or in 1868 is *ipso facto* unconstitutional, or else modern election laws such as those involved in *Burson* v. *Freeman*, 504 U. S. 191 (1992), and *Buckley* v. *Valeo*, 424 U. S. 1 (1976), would be prohibited, as would (to mention only a few other categories) modern antinoise regulation of the sort involved in *Kovacs* v. *Cooper*, 336 U. S. 77 (1949), and *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989), and modern parade-permitting regulation of the sort involved in *Cox* v. *New Hampshire*, 312 U. S. 569 (1941).

Evidence that anonymous electioneering was regarded as a constitutional right is sparse, and as far as I am aware evidence that it was *generally* regarded as such is nonexistent. The concurrence points to "freedom of the press" objections that were made against the refusal of some Federalist newspapers to publish unsigned essays opposing the proposed Constitution (on the ground that they might be the work of foreign agents). See *ante*, at 364–366 (THOMAS, J., concurring in judgment). But, of course, if every partisan cry of "freedom of the press" were accepted as valid, our Constitution would be unrecognizable; and if one were to generalize from these particular cries, the First Amendment would be not only a protection *for* newspapers, but a restriction *upon* them. Leaving aside, however, the fact that no governmental action was involved, the Anti-Federalists had a point, inasmuch as the editorial proscription of anonymity applied only to *them*, and thus had the vice of viewpoint discrimination. (Hence the comment by Philadelphiensis,

quoted in the concurrence: " 'Here we see pretty plainly through [the Federalists'] excellent regulation of the press, how things are to be carried on after the adoption of the new constitution.' " *Ante,* at 365 (quoting Philadelphiensis, Essay I, Independent Gazetteer, Nov. 7, 1787, in 3 Complete Anti-Federalist 103 (H. Storing ed. 1981)).)

The concurrence recounts other pre- and post-Revolution examples of defense of anonymity in the name of "freedom of the press," but not a single one involves the context of restrictions imposed in connection with a free, democratic election, which is all that is at issue here. For many of them, moreover, such as the 1735 Zenger trial, *ante,* at 361, the 1779 "Leonidas" controversy in the Continental Congress, *ibid.,* and the 1779 action by the New Jersey Legislative Council against Isaac Collins, *ante,* at 362, the issue of anonymity was incidental to the (unquestionably free-speech) issue of whether criticism of the government could be *punished* by the state.

Thus, the sum total of the historical evidence marshaled by the concurrence for the principle of *constitutional entitlement* to anonymous electioneering is partisan claims in the debate on ratification (which was *almost* like an election) that a viewpoint-based restriction on anonymity by newspaper editors violates freedom of speech. This absence of historical testimony concerning the point before us is hardly remarkable. The issue of a governmental prohibition upon anonymous electioneering in particular (as opposed to a government prohibition upon anonymous publication in general) simply never arose. Indeed, there probably never arose even the abstract question whether electoral openness and regularity was worth such a governmental restriction upon the normal right to anonymous speech. The idea of close government regulation of the electoral process is a more modern phenomenon, arriving in this country in the late 1800's. See *Burson* v. *Freeman, supra,* at 203–205.

What we have, then, is the most difficult case for determining the meaning of the Constitution. No accepted existence of governmental restrictions of the sort at issue here demonstrates their constitutionality, but neither can their nonexistence clearly be attributed to constitutional objections. In such a case, constitutional adjudication necessarily involves not just history but judgment: judgment as to whether the government action under challenge is consonant with the concept of the protected freedom (in this case, the freedom of speech and of the press) that existed when the constitutional protection was accorded. In the present case, *absent other indication,* I would be inclined to agree with the concurrence that a society which used anonymous political debate so regularly would not regard as constitutional even moderate restrictions made to improve the election process. (I would, however, want further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution.)

But there *is* other indication, of the most weighty sort: the widespread and longstanding traditions of our people. Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness. A governmental practice that has become general throughout the United States, and particularly one that has the validation of long, accepted usage, bears a strong presumption of constitutionality. And that is what we have before us here. Ohio Rev. Code Ann. § 3599.09(A) (1988) was enacted by the General Assembly of the State of Ohio almost 80 years ago. See Act of May 27, 1915, 1915 Ohio Leg. Acts 350. Even at the time of its adoption, there was nothing unique or extraordinary about it. The earliest statute of this sort was adopted by Massachusetts in 1890, little more than 20 years after the Fourteenth Amendment was ratified. No

less than 24 States had similar laws by the end of World War I,[1] and today every State of the Union except California has one,[2] as does the District of Columbia, see D. C. Code

---

[1] See Act of June 19, 1915, No. 171, § 9, 1915 Ala. Acts 250, 254–255; Act of Mar. 12, 1917, ch. 47, § 1, 1917 Ariz. Sess. Laws 62, 62–63; Act of Apr. 2, 1913, No. 308, § 6, 1913 Ark. Gen. Acts 1252, 1255; Act of Mar. 15, 1901, ch. 138, § 1, 1901 Cal. Stats. 297; Act of June 6, 1913, ch. 6470, § 9, 1913 Fla. Laws 268, 272–273; Act of June 26, 1917, § 1, 1917 Ill. Laws 456, 456–457; Act of Mar. 14, 1911, ch. 137, § 1, 1911 Kan. Sess. Laws 221; Act of July 11, 1912, No. 213, § 14, 1912 La. Acts 447, 454; Act of June 3, 1890, ch. 381, 1890 Mass. Acts 342; Act of June 20, 1912, Ex. Sess. ch. 3, § 7, 1912 Minn. Laws 23, 26; Act of Apr. 21, 1906, S. B. No. 191, 1906 Miss. Gen. Laws 295 (enacting Miss. Code Ann. § 3728 (1906)); Act of Apr. 9, 1917, § 1, 1917 Mo. Laws 272, 273; Act of Nov. 1912, § 35, 1912 Mont. Laws 593, 608; Act of Mar. 31, 1913, ch. 282, § 34, 1913 Nev. Stats. 476, 486–487; Act of Apr. 21, 1915, ch. 169, § 7, 1915 N. H. Laws 234, 236; Act of Apr. 20, 1911, ch. 188, § 9, 1911 N. J. Laws 329, 334; Act of Mar. 12, 1913, ch. 164, § 1(k), 1913 N. C. Sess. Laws 259, 261; Act of May 27, 1915, 1915 Ohio Leg. Acts 350; Act of June 23, 1908, ch. 3, § 35, 1909 Ore. Laws 15, 30; Act of June 26, 1895, No. 275, 1895 Pa. Laws 389; Act of Mar. 13, 1917, ch. 92, § 23, 1917 Utah Laws 258, 267; Act of Mar. 12, 1909, ch. 82, § 8, 1909 Wash. Laws 169, 177–178; Act of Feb. 20, 1915, ch. 27, § 13, 1915 W. Va. Acts 246, 255; Act of July 11, 1911, ch. 650, §§ 94–14 to 94–16, 1911 Wis. Laws 883, 890.

[2] See Ala. Code § 17–22A–13 (Supp. 1994); Alaska Stat. Ann. § 15.56.010 (1988); Ariz. Rev. Stat. Ann. § 16–912 (Supp. 1994); Ark. Code Ann. § 7–1–103 (1993); Colo. Rev. Stat. § 1–13–108 (Supp. 1994); Conn. Gen. Stat. § 9–333w (Supp. 1994); Del. Code Ann., Tit. 15, §§ 8021, 8023 (1993); Fla. Stat. §§ 106.143 and 106.1437 (1992); Ga. Code Ann. § 21–2–415 (1993); Haw. Rev. Stat. § 11–215 (1988); Idaho Code § 67–6614A (Supp. 1994); Ill. Comp. Stat. § 5/29–14 (1993); Ind. Code § 3–14–1–4 (Supp. 1994); Iowa Code § 56.14 (1991); Kan. Stat. Ann. §§ 25–2407 and 25–4156 (Supp. 1991); Ky. Rev. Stat. Ann. § 121.190 (Baldwin Supp. 1994); La. Rev. Stat. Ann. § 18:1463 (West Supp. 1994); Me. Rev. Stat. Ann., Tit. 21–A, § 1014 (1993); Md. Ann. Code, Art. 33, § 26–17 (1993); Mass. Gen. Laws § 41 (1990); Mich. Comp. Laws Ann. § 169.247 (West 1989); Minn. Stat. § 211B.04 (1994); Miss. Code Ann. § 23–15–899 (1990); Mo. Rev. Stat. § 130.031 (Supp. 1994); Mont. Code Ann. § 13–35–225 (1993); Neb. Rev. Stat. § 49–1474.01 (1993); Nev. Rev. Stat. § 294A.320 (Supp. 1993); N. H. Rev. Stat. Ann. § 664:14 (Supp. 1992); N. J. Stat. Ann. § 19:34–38.1 (West 1989); N. M. Stat. Ann. §§ 1–19–16 and 1–19–17 (1991); N. Y. Elec. Law § 14–106 (McKinney 1978); N. C. Gen. Stat. § 163–274 (Supp. 1994); N. D. Cent. Code § 16.1–10–04.1 (1981); Ohio Rev.

Ann. § 1–1420 (1992), and as does the Federal Government where advertising relating to candidates for federal office is concerned, see 2 U. S. C. § 441d(a). Such a universal[3] and long-established American legislative practice must be given precedence, I think, over historical and academic speculation regarding a restriction that assuredly does not go to the heart of free speech.

It can be said that we ignored a tradition as old, and almost as widespread, in *Texas* v. *Johnson,* 491 U. S. 397 (1989), where we held unconstitutional a state law prohibiting desecration of the United States flag. See also *United States* v. *Eichman,* 496 U. S. 310 (1990). But those cases merely

Code Ann. § 3599.09(A) (1988); Okla. Stat., Tit. 21, § 1840 (Supp. 1995); Ore. Rev. Stat. § 260.522 (1991); 25 Pa. Cons. Stat. § 3258 (1994); R. I. Gen. Laws § 17–23–2 (1988); S. C. Code Ann. § 8–13–1354 (Supp. 1993); S. D. Comp. Laws Ann. § 12–25–4.1 (Supp. 1994); Tenn. Code Ann. § 2–19–120 (Supp. 1994); Tex. Elec. Code Ann. § 255.001 (Supp. 1995); Utah Code Ann. § 20–14–24 (Supp. 1994); Vt. Stat. Ann., Tit. 17, § 2022 (1982); Va. Code Ann. § 24.2–1014 (1993); Wash. Rev. Code § 42.17.510 (Supp. 1994); W. Va. Code § 3–8–12 (1994); Wis. Stat. § 11.30 (Supp. 1994); Wyo. Stat. § 22–25–110 (1992).

Courts have declared some of these laws unconstitutional in recent years, relying upon our decision in *Talley* v. *California,* 362 U. S. 60 (1960). See, *e. g., State* v. *Burgess,* 543 So. 2d 1332 (La. 1989); *State* v. *North Dakota Ed. Assn.,* 262 N. W. 2d 731 (N. D. 1978); *People* v. *Duryea,* 76 Misc. 2d 948, 351 N. Y. S. 2d 978 (Sup.), aff'd, 44 App. Div. 2d 663, 354 N. Y. S. 2d 129 (1974). Other decisions, including all pre-*Talley* decisions I am aware of, have upheld the laws. See, *e. g., Commonwealth* v. *Evans,* 156 Pa. Super. 321, 40 A. 2d 137 (1944); *State* v. *Freeman,* 143 Kan. 315, 55 P. 2d 362 (1936); *State* v. *Babst,* 104 Ohio St. 167, 135 N. E. 525 (1922).

[3] It might be accurate to say that, insofar as the judicially unconstrained judgment of American legislatures is concerned, approval of the law before us here is universal. California, although it had enacted an election disclosure requirement as early as 1901, see Act of Mar. 15, 1901, ch. 138, § 1, 1901 Cal. Stats. 297, abandoned its law (then similar to Ohio's) in 1983, see Act of Sept. 11, 1983, ch. 668, 1983 Cal. Stats. 2621, after a California Court of Appeal, relying primarily on our decision in *Talley,* had declared the provision unconstitutional, see *Schuster* v. *Imperial County Municipal Court,* 109 Cal. App. 3d 887, 167 Cal. Rptr. 447 (1980), cert. denied, 450 U. S. 1042 (1981).

stand for the proposition that postadoption tradition cannot alter the core meaning of a constitutional guarantee. As we said in *Johnson*, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." 491 U. S., at 414. Prohibition of expression of contempt for the flag, whether by contemptuous words, see *Street* v. *New York*, 394 U. S. 576 (1969), or by burning the flag, came, we said, within that "bedrock principle." The law at issue here, by contrast, forbids the expression of no idea, but merely requires identification of the speaker when the idea is uttered in the electoral context. It is at the periphery of the First Amendment, like the law at issue in *Burson*, where we took guidance from tradition in upholding against constitutional attack restrictions upon electioneering in the vicinity of polling places, see 504 U. S., at 204–206 (plurality opinion); *id.*, at 214–216 (SCALIA, J., concurring in judgment).

## II

The foregoing analysis suffices to decide this case for me. Where the meaning of a constitutional text (such as "the freedom of speech") is unclear, the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs it was intended to enshrine. Even if I were to close my eyes to practice, however, and were to be guided exclusively by deductive analysis from our case law, I would reach the same result.

Three basic questions must be answered to decide this case. Two of them are readily answered by our precedents; the third is readily answered by common sense and by a decent regard for the practical judgment of those more familiar with elections than we are. The first question is whether protection of the election process justifies limitations upon speech that cannot constitutionally be imposed generally. (If not, *Talley* v. *California*, which invalidated a flat ban on

*all* anonymous leafletting, controls the decision here.) Our cases plainly answer that question in the affirmative—indeed, they suggest that no justification for regulation is more compelling than protection of the electoral process. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry* v. *Sanders*, 376 U. S. 1, 17 (1964). The State has a "compelling interest in preserving the integrity of its election process." *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 231 (1989). So significant have we found the interest in protecting the electoral process to be that we have approved the prohibition of political speech *entirely* in areas that would impede that process. *Burson, supra*, at 204–206 (plurality opinion).

The second question relevant to our decision is whether a "right to anonymity" is such a prominent value in our constitutional system that even protection of the electoral process cannot be purchased at its expense. The answer, again, is clear: no. Several of our cases have held that *in peculiar circumstances* the compelled disclosure of a person's identity would unconstitutionally deter the exercise of First Amendment associational rights. See, *e. g., Brown* v. *Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U. S. 87 (1982); *Bates* v. *Little Rock*, 361 U. S. 516 (1960); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449 (1958). But those cases did not acknowledge any general right to anonymity, or even any right on the part of *all* citizens to ignore the particular laws under challenge. Rather, they recognized a right to an *exemption* from otherwise valid disclosure requirements on the part of someone who could show a "reasonable probability" that the compelled disclosure would result in "threats, harassment, or reprisals from either Government officials or private parties." This last quotation is from *Buckley* v. *Valeo*, 424 U. S., at 74 *(per curiam)*, which prescribed the safety valve of a similar exemption in upholding the disclosure requirements of the Federal Election Campaign Act. That is the answer our case law pro-

vides to the Court's fear about the "tyranny of the majority," *ante*, at 357, and to its concern that "'[p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all,'" *ante*, at 342 (quoting *Talley*, 362 U. S., at 64). Anonymity can still be enjoyed by those who require it, without utterly destroying useful disclosure laws. The record in this case contains not even a hint that Mrs. McIntyre feared "threats, harassment, or reprisals"; indeed, she placed her name on some of her fliers and meant to place it on all of them. See App. 12, 36–40.

The existence of a generalized right of anonymity in speech was rejected by this Court in *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288 (1913), which held that newspapers desiring the privilege of second-class postage could be required to provide to the Postmaster General, and to publish, a statement of the names and addresses of their editors, publishers, business managers, and owners. We rejected the argument that the First Amendment forbade the requirement of such disclosure. *Id.*, at 299. The provision that gave rise to that case still exists, see 39 U. S. C. § 3685, and is still enforced by the Postal Service. It is one of several federal laws seemingly invalidated by today's opinion.

The Court's unprecedented protection for anonymous speech does not even have the virtue of establishing a clear (albeit erroneous) rule of law. For after having announced that this statute, because it "burdens core political speech," requires "'exacting scrutiny'" and must be "narrowly tailored to serve an overriding state interest," *ante*, at 347 (ordinarily the kiss of death), the opinion goes on to proclaim soothingly (and unhelpfully) that "a State's enforcement interest might justify a more limited identification requirement," *ante*, at 353. See also *ante*, at 358 (GINSBURG, J., concurring) ("We do not . . . hold that the State may not in other, larger circumstances require the speaker to disclose its interest by disclosing its identity"). Perhaps, then, not

*all* the state statutes I have alluded to are invalid, but just *some* of them; or indeed maybe *all* of them remain valid in "larger circumstances"! It may take decades to work out the shape of this newly expanded right-to-speak-incognito, even in the elections field. And in other areas, of course, a whole new boutique of wonderful First Amendment litigation opens its doors. Must a parade permit, for example, be issued to a group that refuses to provide its identity, or that agrees to do so only under assurance that the identity will not be made public? Must a municipally owned theater that is leased for private productions book anonymously sponsored presentations? Must a government periodical that has a "letters to the editor" column disavow the policy that most newspapers have against the publication of anonymous letters? Must a public university that makes its facilities available for a speech by Louis Farrakhan or David Duke refuse to disclose the on-campus or off-campus group that has sponsored or paid for the speech? Must a municipal "public-access" cable channel permit anonymous (and masked) performers? The silliness that follows upon a generalized right to anonymous speech has no end.

The third and last question relevant to our decision is whether the prohibition of anonymous campaigning is effective in protecting and enhancing democratic elections. In answering this question no, the Justices of the majority set their own views—on a practical matter that bears closely upon the real-life experience of elected politicians and *not* upon that of unelected judges—up against the views of 49 (and perhaps all 50, see n. 4, *supra*) state legislatures and the Federal Congress. We might also add to the list on the other side the legislatures of foreign democracies: Australia, Canada, and England, for example, all have prohibitions upon anonymous campaigning. See, *e. g.*, Commonwealth Electoral Act 1918, § 328 (Australia); Canada Elections Act, R. S. C., ch. E–2, § 261 (1985); Representation of the People Act, 1983, § 110 (England). How is it, one must wonder, that

all of these elected legislators, from around the country and around the world, could not see what six Justices of this Court see so clearly that they are willing to require the entire Nation to act upon it: that requiring identification of the source of campaign literature does not improve the quality of the campaign?

The Court says that the State has not explained "why it can .more easily enforce the direct bans on disseminating false documents against anonymous authors and distributors than against wrongdoers who might use false names and addresses in an attempt to avoid detection." *Ante*, at 352–353. I am not sure what this complicated comparison means. I am sure, however, that (1) a person who is required to put his name to a document is much less likely to lie than one who can lie anonymously, and (2) the distributor of a leaflet which is unlawful because it is anonymous runs much more risk of immediate detection and punishment than the distributor of a leaflet which is unlawful because it is false. Thus, people will be more likely to observe a signing requirement than a naked "no falsity" requirement; and, having observed that requirement, will then be significantly less likely to lie in what they have signed.

But the usefulness of a signing requirement lies not only in promoting observance of the law against campaign falsehoods (though that alone is enough to sustain it). It lies also in promoting a civil and dignified level of campaign debate— which the State has no power to command, but ample power to encourage by such undemanding measures as a signature requirement. Observers of the past few national elections have expressed concern about the increase of character assassination—"mudslinging" is the colloquial term—engaged in by political candidates and their supporters to the detriment of the democratic process. Not all of this, in fact not much of it, consists of actionable untruth; most is innuendo, or demeaning characterization, or mere disclosure of items of personal life that have no bearing upon suitability for office.

Imagine how much all of this would increase if it could be done anonymously. The principal impediment against it is the reluctance of most individuals and organizations to be publicly associated with uncharitable and uncivil expression. Consider, moreover, the increased potential for "dirty tricks." It is not unheard-of for campaign operatives to circulate material over the name of their opponents or their opponents' supporters (a violation of election laws) in order to attract or alienate certain interest groups. See, *e. g.,* B. Felknor, Political Mischief: Smear, Sabotage, and Reform in U. S. Elections 111–112 (1992) (fake United Mine Workers' newspaper assembled by the National Republican Congressional Committee); *New York* v. *Duryea,* 76 Misc. 2d 948, 351 N. Y. S. 2d 978 (Sup. 1974) (letters purporting to be from the "Action Committee for the Liberal Party" sent by Republicans). How much easier—and sanction free!—it would be to circulate anonymous material (for example, a *really* tasteless, though not actionably false, attack upon one's own candidate) with the hope and expectation that it will be attributed to, and held against, the other side.

The Court contends that demanding the disclosure of the pamphleteer's identity is no different from requiring the disclosure of any other information that may reduce the persuasiveness of the pamphlet's message. See *ante,* at 348–349. It cites *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), which held it unconstitutional to require a newspaper that had published an editorial critical of a particular candidate to furnish space for that candidate to reply. But it is not *usual* for a speaker to put forward the best arguments against himself, and it is a great imposition upon free speech to make him do so. Whereas it is quite usual—it is expected—for a speaker to *identify* himself, and requiring that is (at least when there are no special circumstances present) virtually no imposition at all.

We have approved much more onerous disclosure requirements in the name of fair elections. In *Buckley* v. *Valeo,* 424

U. S. 1 (1976), we upheld provisions of the Federal Election Campaign Act that required private individuals to report to the Federal Election Commission independent expenditures made for communications advocating the election or defeat of a candidate for federal office. *Id.,* at 80. Our primary rationale for upholding this provision was that it served an "informational interest" by "increas[ing] the fund of information concerning those who support the candidates." *Id.,* at 81. The provision before us here serves the same informational interest, as well as more important interests, which I have discussed above. The Court's attempt to distinguish *Buckley,* see *ante,* at 356, would be unconvincing, even if it were accurate in its statement that the disclosure requirement there at issue "reveals far less information" than requiring disclosure of the identity of the author of a specific campaign statement. That happens not to be accurate, since the provision there at issue required not merely "[d]isclosure of an expenditure and its use, without more." *Ante,* at 355. It required, among other things:

> "the identification of *each person to whom expenditures have been made* . . . within the calendar year in an aggregate amount or value in excess of $100, the amount, date, *and purpose* of each such expenditure and the name and address of, and office sought by, *each candidate on whose behalf* such expenditure was made." 2 U. S. C. § 434(b)(9) (1970 ed., Supp. IV) (emphasis added).

See also 2 U. S. C. § 434(e) (1970 ed., Supp. IV). (Both reproduced in Appendix to *Buckley, supra,* at 158, 160.) Surely in many if not most cases, this information will readily permit identification of the particular message that the would-be-anonymous campaigner sponsored. Besides which the burden of complying with this provision, which includes the filing of quarterly reports, is infinitely more onerous than Ohio's simple requirement for signature of

campaign literature. If *Buckley* remains the law, this is an easy case.

\* \* \*

I do not know where the Court derives its perception that "anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent." *Ante*, at 357. I can imagine no reason why an anonymous leaflet is any more honorable, as a general matter, than an anonymous phone call or an anonymous letter. It facilitates wrong by eliminating accountability, which is ordinarily the very purpose of the anonymity. There are of course exceptions, and where anonymity is needed to avoid "threats, harassment, or reprisals" the First Amendment will require an exemption from the Ohio law. Cf. *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449 (1958). But to strike down the Ohio law in its general application—and similar laws of 49 other States and the Federal Government—on the ground that all anonymous communication is in our society traditionally sacrosanct, seems to me a distortion of the past that will lead to a coarsening of the future.

I respectfully dissent.